IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BEE VUE,

               Petitioner,               No. CIV S-09-CV-1340 JAM CHS

    vs.

KELLY HARRINGTON,

               Respondent.          FINDINGS AND RECOMMENDATIONS

_____/

## I.  INTRODUCTION

Petitioner, Bee Vue, is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of life without the possibility of parole plus a consecutive term of twenty five years to life with the possibility of parole following his conviction for first degree murder with a penalty enhancement for use of a firearm in the Sacramento County Superior Court.  Here, Petitioner challenges the constitutionality of his conviction.

## II.  ISSUES PRESENTED

Petitioner presents two grounds for relief.  Specifically, the claims are as follow, verbatim:

      (1)     The trial court erred when it ruled defense counsel could not

1

argue in his closing that "reasonable doubt" means "near certainty" – appellant was precluded from offering a full defense to the charges in violation of his federal sixth and fourteenth amendment rights (U.S. CONST. AMED. V, AMEND. VI, AND AMEND. XIV).

(2)     The trial court erred when it denied appellant's <u>Wheeler-Batson</u> motion – the court's ruling violated appellant's state and federal constitutional right to a jury selected according to non-discriminatory criteria (U.S. CONST. AMEND. V, AMEND. XIV, AND VI).

Based on a thorough review of the record and applicable law, it is recommended that both of Petitioner's claims be denied.

## III. FACTUAL BACKGROUND

The basic facts of Petitioner's crimes were summarized in the unpublished opinion of the California Court of Appeals, Third Appellate District, as follows:

An information charged defendant with first degree murder and alleged the special circumstance that defendant committed the murder while engaged in the commission of attempted robbery (Pen. Code, §§ 187, subd. (a) (17).)[FN1] The information also alleged defendant personally discharged a firearm within the meaning of section 12022.53, subdivision (d).

> FN1.   All further statutory references are to the Penal Code unless otherwise indicated.

A jury trial followed.  The evidence adduced at trial revealed the following scenario surrounding Mai's murder.

> FN2.   Because some of the individuals discussed herein have the same or similar surnames, we will use first names to avoid confusion.  No disrespect is intended.

The night of November 21, 2005, police found Mai's body lying face down in the parking lot of a motel.  The breast pocket of Mai's jacket contained his wallet with $330 inside.  Officers recovered three spent nine-millimeter shell cases and four bullet fragments near Mai's body.

**Prelude to the Murder**

Simona Saecho, pursuant to a negotiated plea, pled no contest to a charge of voluntary manslaughter and faced a sentence of between 12 years and 13 years eight months.  Simona met defendant a month or two before the murder.  Defendant and Simona used drugs together

at her family's apartment.

Simona's brother Charlie was dating Cindy Thao prior to the murder. Cindy lived in the Saechos' apartment. Prior to trial, Cindy pled no contest to first degree murder and admitted she was armed during the commission of the offense.

The morning of the murder Cindy drove Simona to a fast food restaurant to meet Cindy's friend, O.G. Johnny (Johnny). Cindy introduced Simona and spoke to Johnny in Hmong, a language Simona did not understand. Johnny asked if the two women wanted to hang out, and they agreed to get together later that day.

That evening Cindy and Simona met Johnny again at the fast food restaurant. Johnny's brother-in-law, Mai, arrived, and the girls followed Johnny to a motel. Johnny checked in, and the group went into on of the motel rooms.

Johnny gave Cindy some money; she left the motel room to buy drugs, and Johnny left to buy beer. Alone in the room, Mai asked Simona to have sex with him for $100. Simona turned him down.

When Cindy returned, she and Simona drove back to the apartment. Cindy told Simona she tried to sell Simona to Mai and Johnny for drug money. Cindy said she wanted to go back to the motel and rob the two men. Simona did not want to go, but Cindy told her she had to.

That same evening, Yeng Yang drove to Simona's apartment looking for defendant. Prior to trial, Yeng entered into a negotiated plea, pleading guilty to a charge of voluntary manslaughter in exchange for a 12-year sentence.

When Yeng arrived at Simona's apartment, defendant came out and spoke with him. Simona and Cindy drove up and joined the duo. Yeng had never met Simona or Cindy before that night. Defendant spoke with Cindy, who, according to Simona, told defendant she wanted to rob the two men at the motel. Defendant said he did not want to but went along with the idea.

Defendant told Yeng that something had happened to Cindy and Simona and they were planning to rob two old men at a motel. Yeng did not want to rob the men but agreed to make sure the men did not resist. Defendant, Yeng, Simona, and Cindy got into Cindy's car after Cindy said, "[Let's just go do it." Cindy carried a revolver in her purse.

As they drove, Cindy outlined how they would rob the men. Defendant and Cindy decided Simona would knock on the motel room door to see if the men were still there. If so, defendant would enter the room and take the men's money. Defendant was armed

3

with a nine-millimeter gun and Yeng carried Cindy's revolver.

**The Murder of Mai Vang**

Meanwhile, back at the motel, Valerie Bader, a prostitute, was approached by Johnny and accompanied him to his motel room. The pair passed Mai, who got into a truck in the motel's parking lot. Valerie agreed to have sex with Johnny for $200 and also agreed to have sex with Mai afterward.

Cindy and the others arrived at the motel and Cindy parked the car near some stairs. Simona got out, saw Mai sitting in his truck, and ran back to the car. Simona told the others she had seen Mai and asked to go home. Defendant said he did not want to go ahead with the planned robbery. Cindy began to drive away, but stopped and spoke to defendant in Hmong. Cindy backed up to Mai's truck and defendant and Yeng got out.

Defendant approached the driver's side of the truck and Yeng walked to the passenger side. Yeng tried to open the door, but it was locked. Defendant tried to open the driver's side door. Simona testified that defendant yelled at Mai; Yeng testified that dendant was talking with Mai about what he had done to Cindy and Simona.

Defendant reached through the driver's side window and unlocked the truck's door. Simona testified defendant leaned inside the truck and got "right up in [Mai's] face." Simona also told officers that defendant grabbed Mai's shirt.

Yeng testified defendant reached in, grabbed Mai's shirt, and demanded his wallet. Defendant held the gun and pointed it at Mai's rib cage. Defendant loaded a round into the gun. Mai grabbed defendant by the neck and fought for the gun. Defendant yanked Mai out of the truck and the men wrestled, struggling over the gun.

Yeng approached the pair and hit or kicked Mai in the face. Defendant fired the gun and Simona saw Mai's head bounce back, as if he had been shot in the head. Mai clung to defendant's waist and legs.

Defendant struggled to elude Mai's group and hit him in the head with the gun. Mai strengthened his grip on defendant. Defendant shot Mai in the left rib cage. Simona saw defendant lying on the ground beneath Mai. Defendant shot Mai again to get Mai to let go of him. Simona saw defendant trying to get out from under Mai, who was lying face down. As defendant got up, he placed the gun into Mai's back and shot him.

Defendant and Yeng, carrying their weapons, got into Cindy's Honda. Simona testified that Yeng said he searched Mai's pockets but did not find a wallet. Yeng testified he did not search Mai. After

4

defendant retrieved his beanie hat from the scene, Cindy sped away. As they left, Mai lay face down and motionless in the parking lot.

Valerie heard the gunshots while in the bathroom of Johnny's motel room. When she looked out the window, Valerie saw Mai lying on the ground. She called 911 as Johnny left the room. As he left, Johnny mentioned a Honda driving away and that his friend had been shot. Valerie saw Johnny drive away in the truck Mai had been sitting in.

The manager of the motel heard two or three gunshots the evening of the murder. The manager saw Mai lying in the parking lot and a man standing nearby. A dark gray truck was parked nearby, which the man got into and drove away.

**Aftermath of the Murder**

Cindy, Yeng, and defendant cautioned Simona about talking about the shooting. Yeng put the revolver in Cindy's purse. Everyone changed clothes and defendant cleaned the guns, putting his in a gun case.

The quartet drove to a bingo hall, stayed for about half an hour, then returned to Simona's apartment. En route, they stopped to buy crystal methamphetamine with the money Cindy received from Johnny. While buying the drugs, Cindy told the seller that she killed someone.

At Simona's apartment, the four smoked the drugs. The next morning, Cindy and Simona bought more drugs. Simona also showed defendant a newspaper article about the shooting.

The following evening officers stopped Cindy and searched the Honda. Officers found a loaded .38-caliber revolver in Cindy's purse on the back floorboard. The search also uncovered a cigarette pack that had one live round in it, identification belonging to Cindy, and receipts from a fast food restaurant. Officers arrested Cindy.

Jordann Coleman met defendant through Jordann's roommate, Webster Vang. Defendant "hung out" in Webster and Jordann's apartment occasionally. Defendant once came to visit, bringing Yeng, Cindy, and another woman. During the visit, defendant waved around a loaded gun, and Cindy pulled out a revolver from her purse. Shortly after Cindy's arrest, Susan Vang saw defendant at Jordann's apartment with a handgun tucked into the waistband of his pants.

Webster testified that defendant admitted he shot an old man because the man attempted to fight back during defendant's attempt to rob him. Defendant told Webster he had the gun in his car. Cindy confirmed defendant's story.

5

After the murder, defendant contacted Sherrie Ly to buy methamphetamine. Sherrie called Phuong Nguyen to see if he had drugs for defendant. Sherrie also asked Phuong if he wanted to buy a nine-millimeter gun. She told Phuong the gun was not "dirty." Phuong ultimately agreed to buy the gun, and Sherrie and defendant met with him and delivered the weapon. Through Sherrie, defendant agreed to sell the gun for about $300 and some methamphetamine.

The day before the murder Donny Vargas saw a nine-millimeter gun in a bedroom of the Saechaos' apartment. Defendant, Cindy, Charlie, and Simona were there. Donny initially testified that Charlie claimed the gun was his but later testified that Charlie said it belonged to defendant. The day after the murder, Donny saw defendant, who asked Donny if he knew anyone who wanted to buy the nine millimeter. By the time Donny located a potential purchaser, defendant had already sold the gun to Phuong. Donny called Phuong and told him to get rid of the gun because it had been used in a murder.

After being alerted by Donny, Phuong tried to sell the gun. Eventually he sold the gun to a buyer from whom officers later recovered it.

**Evidence of the Criminalist and Forensic Pathologist**

A criminalist compared the bullet fragments and cartridge cases found at the scene with the test-fired bullets and cartridge cases from the nine-millimeter gun recovered by police. The criminalist concluded that the three recovered cases were fired from the nine-millimeter weapon. The criminalist also determined an intact bullet recovered from the scene was fired from the weapon. However, there was insufficient information to conclude the recovered bullet fragments were also fired from the nine-millimeter pistol. None of the recovered cases or fragments could have been fired by the .38-caliber revolver.

A forensic pathologist who performed the autopsy on Mai determined Mai suffered two gunshot wounds and a scalp laceration. The wound to Mai's left leg had stippling caused by the gun's muzzle being within two to three feet from Mai when the gun was fired. The other gunshot wound was located in Mai's back, and soot surrounding the wound indicated the muzzle was close to the skin when the gun was fired.

The exit wound was located in Mai's abdomen. The pathologist determined the bullet fired from back to front, left to right, and downward. The bullet entered the left side of Mai's chest and traveled through his lung, heart, and diaphragm. It entered his abdomen, injuring his liver before exiting the body. This wound killed Mai. The pathologist theorized the laceration on Mai's scalp could have been caused by a gun butt.

6

**Defense Case**

Defendant did not testify.  Simona told her father about the shooting the day after the murder.  She did not tell him the whole story.  Simona denied telling her father that Cindy yelled at the person with the gun to shoot the old guy.  Simona denied telling her father that she made Cindy stop the car to let her out and that she walked home.

Simona testified her father was home the day of the murder and the following day, and could have seen defendant and Cindy in the apartment on those days.  She denied telling her father that the man with the gun tripped and accidentally squeezed the trigger of the gun, firing twice.  One shot hit the victim in the chest, the other struck his forehead.  After the victim fell, defendant shot him once more in the back.

Simona told her father that she asked Cindy to stop the car three times on the way home after the murder.  Cindy stopped the car and Simona walked home.  She was afraid.

Simona's father did not see defendant, Cindy, or Yang in the apartment after the murder.

**Aftermath**

The jury found defendant guilty of first degree murder and found the special circumstance and enhancement allegations true.  The court sentenced defendant to life in prison without the possibility of parole for first degree murder.  The court further sentenced defendant to a consecutive term of 25 years to life for the firearm enhancement and imposed various fines and fees.  Defendant filed a timely notice of appeal.

(Lodged Doc. 4 at 2-10).

The appellate court affirmed Petitioner's conviction on October 2, 2008 with a reasoned opinion.  Petitioner next sought review of his convictions in the California Supreme Court, which was denied without comment on December 23, 2008.  Petitioner filed this federal petition for writ of habeas corpus on April 29, 2009.  Respondent filed an answer on February 1, 2010, and Petitioner filed his traverse on March 23, 2010.

## IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after

1   its enactment on April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114

2   F.3d 1484, 1499 (9th Cir. 1997).   Under AEDPA, an application for a writ of habeas corpus by a

3   person in custody under a judgment of a state court may be granted only for violations of the

4   Constitution, federal laws, or treaties of the United States.  28 U.S.C. § 2254(a); *Estelle v. McGuire*,

5   502 U.S. 62, 67-68 (2001); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000).   Federal habeas

6   corpus relief is not available for any claim decided on the merits in state court proceedings unless

7   the state court's adjudication of the claim:

8      (1) resulted in a decision that was contrary to, or involved an
       unreasonable application of, clearly established federal law, as
9      determined by the Supreme Court of the United States; or

10     (2) resulted in a decision that was based on an unreasonable
       determination of the facts in light of the evidence presented in the
11     State court proceeding.

12    28 U.S.C. § 2254(d).  Although "AEDPA does not require a federal habeas court to adopt any one

13   methodology," *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003), there are certain principles which guide

14   its application.

15          First, AEDPA establishes a "highly deferential standard for evaluating state-court

16   rulings." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  Accordingly, when determining whether

17   the law applied to a particular claim by a state court was contrary to or an unreasonable application

18   of "clearly established federal law," a federal court must review the last reasoned state court

19   decision. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911,

20   918 (9th Cir. 2002).  Provided that the state court adjudicated petitioner's claims on the merits, its

21   decision is entitled to deference, no matter how brief.  *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232

22   F.3d 1031, 1035 (9th Cir. 2000).  Conversely, when it is clear that a state court has not reached the

23   merits of a petitioner's claim, or has denied the claim on procedural grounds, AEDPA's deferential

24   standard does not apply and a federal court must review the claim de novo.  *Nulph v. Cook*, 333 F.3d

25   1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

26          Second, "AEDPA's 'clearly established Federal law' requirement limits the area of

8

law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme Court decisions." *Robinson*, 360 F.3d at 155-56 (citing *Williams*, 529 U.S. at 381). In other words, "clearly established Federal law" will be " the governing legal principle or principles set forth by [the U.S. Supreme] Court at the time a state court renders its decision." *Lockyer*, 538 U.S. at 64. It is appropriate, however, to examine lower court decisions when determining what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. *See Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000).

Third, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meanings." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal court may grant a writ of habeas corpus only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405. It is not necessary for the state court to cite or even to be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Moreover, a state court opinion need not contain "a formulary statement" of federal law, but the fair import of its conclusion must be consistent with federal law. *Id.*

Under the "unreasonable application" clause, the court may grant relief "if the state court correctly identifies the governing legal principle...but unreasonably applies it to the facts of the particular case." *Bell*, 535 U.S. at 694. As the Supreme Court has emphasized, a court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 410. Thus, the focus is on "whether the state court's application of clearly established federal law is *objectively* unreasonable." *Bell*, 535 U.S. at 694 (emphasis added).

Finally, a petitioner bears the burden of demonstrating that the state court's decision was either contrary to or an unreasonable application of federal law. *Woodford*, 537 U.S. at 24 ;

1 | *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

2 | **V.  DISCUSSION**

3 | **A.      REASONABLE DOUBT**

4 |       Petitioner claims that he was denied his rights to a fair trial, to present a complete

5 | defense, and to due process when the trial court precluded defense counsel from arguing that

6 | "beyond a reasonable doubt" means "near certainty."  He argues that his trial counsel raised several

7 | points in closing argument that constituted reasonable doubt that Petitioner was the shooter.  Thus,

8 | Petitioner contends that if trial counsel had been permitted to argue that near certainty that a crime

9 | has occurred does not establish near certainty as to the identity of the perpetrator of that crime, the

10 | result of his trial would have been different.  According to Petitioner, absent such argument

11 | regarding a "near certainty" standard of proof, the jury was unlikely to understand the significance

12 | of the "abiding conviction" language used in California to define "beyond a reasonable doubt."  On

13 | direct appeal, the state court found that the trial court so erred, but declined to find that Petitioner

14 | suffered any prejudice as a result of the error, explaining the background of the claim and its

15 | reasoning as follows:

16 | Defendant argues the trial court erroneously denied defense counsel's
17 | request to argue, during closing argument, that reasonable doubt
 | means "near certainty."   According to defendant, the trial court
 | confused "moral certainty," no longer a viable description of
18 | reasonable doubt, with "near certainty."

19 | **Background**

20 | Prior to closing argument, defense counsel requested to be allowed
21 | to argue that proof beyond a reasonable doubt means near certainty.
 | The prosecution objected.

22 | In sustaining the objection, the court stated: "This Court's
23 | interpretation is that the near certainty language is attached as a
 | matter of historical references in case law really to the moral
 | certainty term which is no longer included in the jury instruction. [¶]
24 | It is now through People [v.] Freemen [(1994) 8 Cal.4th 450] and the
 | CALCRIM instructions which are presently before the court, this
25 | concept beyond a reasonable doubt and abiding conviction and
 | therefore it seems to me to be inappropriate to then effectively argue
26 | that the law means near certainty, which is by way of argument

10

inserting back in the ambiguity surrounding the word certainty which the California court took out in Freeman.  [¶] The risk becomes apparent if you start considering, for example, other adjectives, near certainty, virtual certainty, practically certain.  You get into the same kind of phrases and issues that surround moral certainty."

The court instructed the jury as to the standard of proof pursuant to CALCRIM no. 220: "It is the testimony that must guide your deliberations not your notes.  The fact that a criminal charge has been filed against a defendant is not evidence that the charge is true.  You must not be biased against the defendant just because he has been arrested, charged with a crime or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent . . . .  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. [¶] Whenever I tell you the People must prove something, I mean prove it beyond a reasonable doubt.  Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all evidence that was received throughout the entire trial.  Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

## Discussion

Defendant faults the trial court for not allowing defense counsel to argue during closing argument that proof beyond a reasonable doubt means to a "near certainty."  According to defendant, the court's error prevented defense counsel from rendering effective assistance, undermined his right to a fair trial, and precluded defendant from presenting a full defense.

Defense counsel is given wide latitude in closing argument. (*People v. Farmer*, (1989) 47 Cal.3d 888, 922.)  However, the trial court possesses broad discretion in controlling the duration and limiting the scope of closing argument.  The trial court may ensure that counsel's argument does not unduly stray from the mark or impede the orderly conduct of the trial. (*Herring v. New York*, (1975) 422 U.S. 853, 862 [45 L.Ed.2d 593].)

As both parties acknowledge, the Legislature, in 1995, deleted the phrase "to a moral certainty" from section 1096 (Stats. 1995, ch. 46, § 1, p. 120), on which CALJIC No. 2.90 is based.  The action followed decisions by the United States Supreme Court and the California Supreme Court finding the term "moral certainty" in the abstract added nothing to a jury's understanding of the meaning of reasonable doubt. (*Victor v. Nebraska*, (1994) 511 U.S. 1, 14-15 [127 L.Ed.2d 583]; *People v. Freeman* (1994) 8 Cal.4th 450, 503-504.)

However, both parties also acknowledge that courts have found that proof beyond a reasonable doubt is the equivalent to "a near certainty." (*People v. Hall*, (1964) 62 Ca.2d 104, 112; *People v. Wade* (1971) 15 Cal.App.3d 16, 26.) Despite this authority, the trial court denied defense counsel's request to argue that reasonable doubt means near certainty.

Although the court possesses great latitude in circumscribing closing argument, this denial does not appear appropriate. Under section 1044 it is the duty of the trial court "to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." In arguing "[near] certainty"[1] in relation to reasonable doubt, defense counsel was not straying from material and relevant matters, nor was counsel's request unduly consumptive of time or likely to confuse the jurors as to those matters under their consideration.

The parties disagree over the appropriate standard of review for such error. The People argue, under *Watson*, that any error in limiting the scope of closing argument would warrant reversal only if it were reasonably probable the jury would have reached a different result if defense counsel had been permitted to make the "near certainty" argument. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Defendant contends the trial court's ruling violated his constitutional right to present a defense and to a fundamentally fair trial. Therefore, reversal is required unless the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].) We find the error harmless under either standard.

Defendant argues the evidence as to the identity of the person who pulled the trigger was not strong. Therefore, it was imperative for defense counsel to clarify that beyond a reasonable doubt means near certainty; counsel wanted the jury to consider that near certainty that a crime has occurred does not establish near certainty as to who actually committed the crime.

We disagree. Simona and Yeng testified defendant shot Mai. Despite some minor inconsistencies in their respective recitation of events, both unequivocally stated defendant fired the gun that killed Mai.

Other evidence also identified defendant as the perpetrator. Jordann saw both defendant and Cindy with weapons around the time of the murder. Several days after the murder, Susan saw defendant at

---

[1] The opinion of the state appellate contains an incorrect reference to "moral" certainty as opposed to "near certainty" in this sentence. A review of the court's opinion, however, indicates that this reference was likely a typo.

Jordann's apartment with a handgun tucked into his waistband. Defendant admitted to Webster that he shot an old man three times during a robbery attempt. Sherrie testified defendant sold the murder weapon to Phuong after the murder.

The trial court properly instructed the jury on the meaning of reasonable doubt. Defense counsel argued at length that there was reasonable doubt defendant wielded the gun that killed Mai. Under these circumstances and given the evidence at trial, it is inconceivable beyond a reasonable doubt that if the trial court had permitted defense counsel to argue reasonable doubt requires a near certainty, the jury would have reached a different result.

(Lodged Doc. 4 at 11-15). It is thus clear that although the state appellate court found that the trial court had improperly prohibited Petitioner's trial counsel from arguing that reasonable doubt meant "near certainty," the appellate court nonetheless found that Petitioner suffered no prejudice as a result of the error.

The state appellate court's decision was not contrary to or an unreasonable application of clearly established federal law. In state criminal trials, the Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358, 364 (1970). While the "beyond a reasonable doubt" standard is a due process requirement, "the [federal] Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). Indeed, "so long as the [trial] court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Id.* (internal citations omitted). "Rather,' taken as a whole, the instructions must convey the concept of reasonable doubt to the jury.'" *Id.* (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954). Thus, the proper inquiry is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Id.* at 6. *See also Ramirez v. Hatcher*, 136 F.3d 1209, 1211 (9th Cir. 1998).

1    In Petitioner's case, the jury was instructed on reasonable doubt pursuant to a version

2    of California Criminal Jury Instruction 220 as follows:

> The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.
>
> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.
>
> Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.
>
> In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

(CT at 786-87).

    This reasonable doubt instruction properly conveyed to the jury that the prosecution

bore the burden of proving beyond a reasonable doubt that Petitioner committed the murder of Mai

Vang. The United States Supreme Court has upheld the "abiding conviction" language in California

Criminal Jury Instruction 220 as a correct statement of the government's burden of proof. *Victor*,

511 U.S. at 14-15 (citing *Hopt v. Utah*, 120 U.S. 430, 439 (1887) ("The word 'abiding' here has the

signification of settled and fixed, a conviction which may follow a careful examination and

comparison of the whole evidence")). Moreover, contrary to Petitioner's claim, the only reasonable

interpretation of this instruction is that if evidence presented to the jury was insufficient to prove

each element of the offense beyond a reasonable doubt, such lack of evidence would have been

sufficient to acquit Petitioner. The Constitution does not require anything more. *Victor*, 511 U.S.

at 5 (As long as the jury is instructed on the necessity that a criminal defendant's guilt be proven

beyond a reasonable doubt, no particular words are required by the Constitution to advise the jury

of the government's burden of proof).

To the extent Petitioner is arguing that the trial court's decision adversely affected his ability to present a complete defense under federal law, this argument is without merit. It is well established that a criminal defendant has a constitutional right to make a closing argument. *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (citing *Herring v. New York*, 422 U.S. 853, 865 (1975). However, the United States Supreme Court has recognized that the right to make a closing argument does not mean that

> . . . closing arguments in a criminal case must be uncontrolled or even unrestrained. The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of trial. In all these respects, he must have broad discretion.

*Herring*, 422 U.S. at 862. Here, although Petitioner's trial counsel was precluded from arguing that the "beyond a reasonable doubt" standard of proof was equivalent to a standard of "near certainty," counsel was not precluded from arguing extensively to the jury that reasonable doubt existed in Petitioner's case. While "near certainty" would also have been an appropriate description of the "beyond a reasonable doubt" standard, *see, e.g., Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (the reasonable doubt standard serves to impress "upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused"); *People v. Zepeda*, 167 Cal.App.4th 25, 28-29 (2008), Petitioner has not demonstrated how the trial court's restriction on the defense closing summation was contrary to or an unreasonable application of the principle set forth in *Herring*.

In addition, federal habeas corpus relief cannot be granted without a showing that the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Bains v. Cambra*, 204 F.3d 964, 971 n.2 (9th Cir. 2000) (habeas corpus relief is unwarranted unless "it is reasonably probable that a result more favorable to the appealing party

would have been reached in the absence of the error") (internal quotations omitted)).  Thus, even

assuming arguendo, as the state appellate court concluded, that the trial court erred by precluding

trial counsel from arguing to the jury that "beyond a reasonable doubt" meant "near certainty,"

Petitioner has failed to demonstrate that the alleged error had a "substantial and injurious effect on

the outcome of his trial.  *Brecht*, 507 U.S. at 623.  As noted by the state appellate court, substantial

evidence introduced at trial supported a jury finding that Petitioner was guilty of shooting Mai Vang.

Simona Saechao testified that she was present in Cindy's car during the robbery and

that she saw Petitioner pull the victim from his truck, and that it appeared that Petitioner was

choking him.  (RT at 199).  In addition, Simona testified that while watching Petitioner and the

victim struggling, she heard a gun go off and saw the victim's head bounce backwards as if he had

been shot in the head.  (RT at 201).  Simona then heard a second shot, and observed Petitioner on

his back on the ground with a gun in his hand and the victim on top of him.  (RT at 202).  Petitioner

then got out from underneath the victim, placed the gun on the left side of the victim's back, and

shot him again.  *Id.*  Following the shooting, Petitioner got back into the front seat of Cindy's car

with the gun.  (RT at 208).

Yeng Yang testified that he rode in Cindy Thao's car along with Petitioner, Cindy

and Simona to the parking lot of the motel for the purpose of committing the robbery.  Once they

arrived, he observed Petitioner place a gun in the waistband of his pants and exit Cindy's car.  (RT

at 938-40).  Petitioner approached the victim's truck and Yang could hear the two men speaking to

each other.  (RT at 941-42).  Petitioner reached opened the door of the truck, grabbed the victim by

his collar and asked for his wallet.  (RT at 944).  He pulled the gun from his waistband and pointed

it at the rib cage of the victim.  (RT at 945).  The victim told Petitioner that he did not have any

money, and Petitioner took the safety off of the gun and chambered a round.  *Id.*  Petitioner and the

victim struggled with the gun, and Petitioner pulled the victim out of the car.  (RT at 946).  The two

men were on the ground and continued to struggle with their arms around each other.  (RT at 947).

Yang walked in front of both of them, kicked the victim in the face, and heard a gunshot go off.  (RT

16

at 947-48).  The victim was hanging onto Petitioner, who had a gun in his right hand and was trying to remove himself from the victim's grasp.  (RT at 948-49).  Petitioner hit the victim, who continued to cling to Petitioner, on the head with the gun.  (RT at 950).  Yang then observed Petitioner shoot the victim a second and a third time.  (RT at 950-53).

Jordann Coleman testified that she saw Petitioner and Cindy with guns in their possession around the time that the murder was committed.  (RT at 394-97).  Susan Vang testified that, following the murder, she observed Petitioner at Jordann's apartment with a gun tucked into the waistband of his pants.  (RT at 619-20).  Webster Vang testified that he had seen Petitioner and Cindy  in the possession of both a revolver and a pistol at Jordann's apartment prior to the shooting.  (RT at 696-98).  In addition, approximately a week or two  after after the murder took place, Petitioner confessed to Vang that he had shot an old man three times.  (RT at 693-95).  Sherrie Ly testified that she assisted Petitioner in selling Phuong Nguyen a gun.  (RT at 732-748).  Phuong Nguyen testified that he bought a gun from Petitioner for two hundred dollars and approximately a gram of methamphetamine.  (RT at 777).  Phuong later discovered that the gun he purchased from Petitioner had been used in the murder with which Petitioner was charged.  (RT at 779-80).  At trial Phuong identified a picture of the murder weapon as the gun he purchased from Petitioner.  (RT at 787-788).

In light of the evidence presented to the jury at trial, as summarized above, it is not reasonably likely that had counsel been permitted to argue that the "beyond a reasonable doubt" standard was equivalent to a standard of "near certainty," the outcome of Petitioner's trial would have been different.

Petitioner is not entitled to federal habeas corpus relief on this claim.

## B.    BATSON-WHEELER

Petitioner, who is of Thai descent, claims that the trial court erred when it denied his *Batson-Wheeler* motion, in violation of his right to an impartial jury selected on a race-neutral basis.  According to Petitioner, the prosecution's reasons for challenging seven of the potential jurors were

1 unsupported by the record and, in some instances, false.  In addition, Petitioner contends that some

2 of the prosecutor's proffered reasons applied equally to non-minority and non-ethnic jurors who

3 were not challenged by the prosecutor.

4    In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court held that

5 the Equal Protection Clause prohibits a prosecutor from exercising peremptory challenges to strike

6 a venire person on the basis of race.  *People v. Wheeler*, 22 Cal.3d 148 (1978), is the California state

7 counterpart to *Batson*.  *Yee v. Duncan*, 463 F.3d 893, 896 (9th Cir. 2006).  However, it is the

8 standards of *Batson* that control the disposition of Petitioner's claim on federal habeas corpus

9 review.  *Lewis v. Lewis*, 321 F.3d 824, 827 (9th Cir. 2003).

10    In order to prevail on a *Batson* claim, a defendant must first establish a prima facie

11 case of purposeful discrimination.  *Batson*, 476 U.S. at 96-97; *Lewis*, 321 F.3d at 830; *United States*

12 *v. DeGross*, 960 F.2d 1433, 1442 (9th Cir. 1992).  "To establish a prima facie case, the defendant

13 must show that 'he is a member of a cognizable racial group,' *Batson*, 476 U.S. at 96, and that 'the

14 facts and circumstances of the case raise an inference' that the prosecution has excluded venire

15 members from the petit jury on account of their race."  *McClain v. Prunty*, 217 F.3d 1209, 1219-20

16 (9th Cir. 2000) (quoting *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000)).  In deciding

17 whether a defendant has made the requisite showing, the trial court should consider all relevant

18 circumstances.  *Batson*, 476 U.S. at 96.

19    If a prima facie case is made out, "the burden shifts to the State to come forward with

20 a neutral explanation for challenging" the jurors in question.  *Batson*, 476 U.S. at 97; *DeGross*, 960

21 F.2d at 1442; *Stubbs*, 189 F.3d at 1104.  "The prosecution's challenges need not rise to the level

22 justifying use of a challenge for cause."  *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989)

23 (citing *Batson*, 476 U.S. at 87-98).  For the purposes of this step, however, the prosecutor's

24 explanation need not be "persuasive or even plausible."  *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

25 Rather, a neutral explanation in this context "means an explanation based on something other than

26 the race of the juror."  *McClain*, 217 F.3d at 1220 (quoting *Hernandez v. New York*, 500 U.S. 352,

360 (1991)).  "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral."  *McClain*, 217 F.3d at 1220 (quoting *Stubbs*, 189 F.3d at 1105).  As with any credibility determination, the trial court's own observations are of significant importance.  *Batson*, 476 U.S. at 98, n.21.  *See also Lewis*, 321 F.3d at 830.

At the final step of this inquiry, "the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination."  *McClain*, 217 F.3d at 1220 (quoting *Hernandez*, 500 U.S. at 359).  *See also Batson*, 476 U.S. at 98.  The court must evaluate the prosecutor's reasons and make a credibility determination.  *Lewis*, 321 F.3d at 830.  A comparative analysis of the struck juror with empaneled jurors "is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination."  *Lewis*, 321 F.3d at 830.  If a review of the record undermines the prosecutor's stated reasons, or many of the stated reasons, then the explanation may be deemed a pretext.  *Id*.  The proffer of various faulty reasons and only one or two otherwise adequate reasons may undermine the prosecutor's credibility to such an extent that a court should sustain a *Batson* challenge.  *Id*. at 831.

On the other hand, "[t]he fact that a prosecutor's reasons may be 'founded on nothing more than a trial lawyer's instincts about a prospective juror' does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions."  *Power*, 881 F.2d at 740 (quoting *United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989)).  "Excluding jurors because of their profession, or because they were acquitted in a prior case, or because of a poor attitude in answer to voir dire questions is wholly within the prosecutor's prerogative."  *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987).  "Evidence in the record of objective reasons to strike a juror implies that racial bias did not motivate the prosecutor."  *Boyd v. Newland*, 393 F.3d 1008, 1013 (9th Cir. 1987).

Petitioner bears the burden of demonstrating the existence of unlawful discrimination, *Batson*, 476 U.S. at 93, as this burden of persuasion "rests with, and never shifts from, the opponent

of the strike." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). However, Petitioner "is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson*, 476 U.S. at 96 (quoting *Avery v. Georgia*, 345 U.S. 559 662 (1953)).

In this case, the jurors in question were Mr. Khan, East Asian; Mr. Maness, African-American; Ms. Gildersleeve, African-American; Ms. Jurgensen, Filipina/Asian; Ms. Pinnock, Native American; Ms. Saenz, Hispanic; and Ms. Key, Hispanic. As the California Court of Appeal noted, the state trial court found that defense counsel presented a prima facie case of purposeful discrimination, and the record contains the prosecutor's explanations for the dismissal of each juror as well as the trial court's ruling on the question of intentional discrimination. On direct review, the state appellate court gave a reasoned decision with respect to the ultimate question of intentional discrimination as it pertained to each juror. (Lodged Doc. 4 at 15-32). Thus, on federal habeas review, the preliminary issue of whether petitioner established a prima facie case of purposeful discrimination need not be addressed. *See Collins v. Rice*, 365 F.3d 667, 677 n.6 (9th Cir. 2004) (the preliminary issue of a prima facie showing need not be addressed where the state court ruled on the ultimate question of intentional discrimination under steps two and three of the *Batson* analysis).

Following the trial court's determination that a case of purposeful discrimination had been established, the prosecutor explained her reasoning for striking the jurors in question as follows:

| THE COURT: | Okay. The Court finds a prima facie case and let me hear from the People. |
|---|---|
| [PROSECUTOR]: | Thank you. First, I should indicate for the record while we had race on the questionnaires, I actually did not make any note of race from the questionnaires. |
| | I did make notes when individual jurors were challenged both by the defense and by the People. It was my belief in regard to the |

eleven challenges that I used that there were six individuals who were white or Caucasian including Ms. Castorena and Ms. Saenz and Ms. Key all of them appeared to me to be of Caucasian race.  That being said, in regard to the challenges issued specifically as to the individuals mentioned by the defense as to Mr. Sharaaz Khan.

Mr. Khan in his jury questionnaire indicated that he was fearful of making the wrong decision that might effect someone's life and when questioned about this; although he indicated he was all right with the burden of proof, I was concerned in regard to his feelings that his decision would impact a life especially given the circumstances in this case and the fact it is a special circumstances case.

As to juror - - potential juror Jordann Maness, Mr. Maness was recently arrested in November of 2006 and prosecuted by my office for a domestic violence 273.5 of the Penal Code.

In addition Mr. Maness, I observed on multiple occasions during the questioning process sitting in a seat with his eyes closed, did not appear to be paying attention when others were being asked questions and on multiple occasions had his eyes closed during the selection of the jurors.

In regard to potential juror, Kajuana Gildersleeve indicated that she felt that police officers were not always truthful.  And when specifically questioned about this, she indicated she had no personal circumstances that had occurred to her.  However, she does have that belief, that officers are not always truthful.  She has read about it in the newspaper.  She's heard about it on the news.

In addition, she also feels that people are not tried fairly and again she based this on reading the newspaper and hearing it on the news. Although, she indicated she had no personal knowledge.  She indicated those were her concerns and that she did have those thoughts in her head.  In addition, she indicated that she did not feel the Indian betting law was an

1     appropriate law.  She did not like it.  Based on
      those comments, the challenge was issued as
2     to her.

3     . . . .

4     As to Gwennetta Pinnock, Miss Pinnock was
      an individual, potential juror we questioned
5     outside the presence of the other jurors.  Ms.
      Pinnock had many, many areas of private
6     issues including areas regarding individuals in
      her family who have been arrested for various
7     crimes and specifically er son who is in prison
      at this time.  While Ms. Pinnock indicated she
8     felt she could still be fair given the
      circumstances of the fact that her son is in
9     prison[,] was prosecuted in this county and the
      other individuals in her family and their
10    circumstances, I have some concerns.   In
      addition, she indicated she felt the right thing
11    had happened.  She also said he is my son and
      she had some feelings about how he was
12    treated even though she kind of went back and
      forth said she felt he was treated fairly and yet
13    she also indicated she had some strong
      feelings because of what happened to him
14    because he was her son.

15    As to Maya Key, I indicated in my note, she
      was white female.   I do see on her
16    questionnaire she does have white/Hispanic.
      In regard to Ms. Key, she indicated that.

17

      THE COURT:          Just one second.
18
      (Brief pause.)
19
      [PROSECUTOR]:       She felt that individuals were not treated fairly
20                        in the system.  She wasn't able to articulate
                          specifically why she felt that way, but she did
21                        feel that the system did not treat others fairly.
                          I am sorry, I am having trouble reading my
22                        note here.

23                        I believe Ms. Key also had work experience
                          with attorneys that she described as both good
24                        and bad, I believe, that's what my note says
                          there.   And I think I skipped Ms. Ana
25                        Jurgensen.

26    THE COURT:          Can I just have a moment.

1          (Brief pause.)

2          THE COURT:      Okay.  Thank you.

3          [PROSECUTOR]:    I am sorry, I believe I skipped Ana Jurgensen. Ms. Jurgensen is a Filipino femal.  Ms. Jurgensen, when talked specifically to by the Court during voir dire appeared to be having language issues with the Court in answering questions.  I then reviewed her questionnaire and it did appear that at times she did not understand the nature of the questions and on further requesting she did appear to me to have some hesitancy in understanding in answering the questions that were posed to her and I felt she may have issues understanding what was going on in the courtroom.

Although, she did not specifically state that, that is what I observed during her questioning and also her questionnaire.

I think, I covered all the individuals that the defense indicated they felt were minorities. Did the Court wish me to give reasons as to the rest of the individuals that were challenged by the People?

THE COURT:      No.

THE COURT:      I need to hear you on Ms. Saenz.

[PROSECUTOR]:    Stephanie Saenz.

THE COURT:      Stephanie Saenz.  Did you speak to that.

[PROSECUTOR]:    I did not.  I believed her to be a white female.

THE COURT:      She appears to be a white female.  She identifies as Mexican American.  I am going to need 30 seconds.

(Brief pause.)

THE COURT:      Thank you for your patience.

[PROSECUTOR]:    I am sorry, did you want to hear on Ms. Saenz?

THE COURT:      Yes.

| | |
|---|---|
| [PROSECUTOR]: | In regard to Ms. Saenz, first, again it was my belief she was a white female.  I did not know she indicated Mexican American on her questionnaire. |
| | In Ms. Saenz's questionnaire on multiple occasions she marked answers that indicated [one], that she would not discuss the issues with other jurors, that she would not listen to the views presented by other jurors and present her own views. |
| | She indicated she would hold the People to a higher standard of proof than beyond a reasonable doubt and she also said she would disfavor the testimony of police officers while asked on voir dire about these different areas she indicated those were errors.  Though the People had concerns especially given the number of questions she answered incorrectly that she either was not paying attention to the questions and answering them incorrectly or in fact she indeed had issues in these areas and was not being completely forthright with the Court and counsel. |

(Aug. R.T. at 305-310).

In rejecting the *Batson-Wheeler* motion, the trial court stated:

| | |
|---|---|
| THE COURT: | Okay.  I am going to deny the motion here.  The record doesn't reflect the time the Court has gone to or taken asking attorneys to wait patiently as I reread the questionnaires and reviewed my notes. |
| | I am ruling both individually and cumulatively at this point, because there were genuine reasons, neutral justifications to explain all of the challenges here, which the Court finds they are genuine and I will adopt them as articulated by the District Attorney in this case. |
| | The one that was closest in this Court's mind actually was Key.  And this is a lady who believes there are some systemic discrimination towards minorities. |
| | This position is not devoid of merit.  When you look at it superficially just in terms of the |

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

raw numbers, but it rises inference - - raises the inference that the system, law enforcement, District Attorneys in particular would be a concern to the prosecution here as stated is tiled in a way which is unfair subsequent to the initial arrest in particular.

I am also in evaluating Key's, evaluating the very credible reasons articulated for the other prospective jurors and taking note that I have two attorneys before me at this time which enjoy high credibility with the Court.

Finally, I would note that there are three African American[s] and on Hispanic as a juror at this time. These are people which the District Attorney passed on earlier at a point where the jury could have been sworn, but for the unusual circumstances surrounding the doctor.

This looks closer on the record in the written word than when you are here in the room. I am persuaded these are genuine raised neutral exercised challenges and the motion is therefore denied.

(Aug. R.T. at 310-312).

To grant habeas corpus relief "[u]nder AEDPA, . . . a federal habeas court must find the state-court conclusion 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting 28 U.S.C. § 2254(d)(2). "[A] federal habeas court can only grant [habeas corpus relief] if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Id.* In determining whether a state court's application of law or factual determination is "unreasonable," the court cannot simply consider whether it would have reached a different outcome on the same record. *Id.* ("Reasonable minds reviewing the record might disagree about" what the ultimate issue is for habeas corpus relief). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Only if the evidence is "too powerful to conclude anything but" the contrary should the district court grant

relief. *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005).

The California Court of Appeal, Third Appellate District, issued the last reasoned decision on the merits of Petitioner's claim, summarizing the facts and circumstances surrounding the dismissal of the seven potential jurors and explaining its conclusion as follows:

> Defendant contends the trial court erred in denying his *Batson/Wheeler* motion during jury selection. (*Batson v. Kentucky* (1986) 476 U.S. 79, 34 [90 L.Ed.2d 69] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 (*Wheeler*).) According to defendant, the prosecution's reasons for challenging numerous jurors were unsupported by the record, were false, or were not race-neutral.
>
> **Background**
>
> During voir dire, defense counsel brought a motion pursuant to *Batson*, arguing the prosecutor was exercising her challenges to prospective jurors in a discriminatory manner. Defense counsel noted the prosecutor made 11 peremptory challenges, eight of which involved persons of color.[FN3] The trial court found defense counsel presented a prima facie case and asked the prosecutor to explain the challenges.
>
> > FN3.   The eight prospective jurors were Mr. Kahn, East Asian; Mr. Maness, African-American, Ms. Gildersleeve, African-American; Ms. Jurgensen, Filipina/Asian; Ms. Pinnock, Native American; Ms. Saenz, Hispanic; Ms. Castorena, Hispanic; and Ms. Key, Hispanic. Since Castorena identified herself as Caucasian on her questionnaire, defendant does not challenge her exclusion on appeal. The prospective jurors were identified by name in the record.
>
> The prosecutor stated she had not made any note of jurors' races from the juror questionnaires. She did make notes during challenges, and of the 11 challenges, the prosecutor believed six to be Caucasian, including Castorena, Saenz, and Key. The prosecutor then explained each of the challenges individually. We provide complete summaries below.
>
> After the prosecutor gave her reasons for the challenges, defense counsel stated: "I would just add there are some persons who . . . are currently on the jury that haven't been kicked. Specifically, there were some other persons who had different views in terms of the criminal justice system that were not kicked . . . . So I'll just leave it at that."
>
> The court denied defense counsel's motion, stating: "The record doesn't reflect the time the Court has gone to or taken asking

attorneys to wait patiently as I reread the questionnaires and reviewed my notes. [¶] I am ruling both individually and cumulatively at this point, because there were genuine reasons, neutral justifications to explain all of the challenges here, which the Court finds they are genuine and I will adopt them as articulated by the District Attorney in this case."

The court did note the closest case involved prospective juror Key, who believed there was systemic discrimination toward minorities. The court found this position not devoid of merit, but it raised the inference that law enforcement is tilted in a way that is unfair. In evaluating Key, the court considered "the very credible reasons articulated for the other prospective jurors and taking note that I have two attorneys before me at this time which enjoy high credibility with the Court."

Finally, the court noted three African-Americans and one Hispanic remained as jurors, jurors the prosecution had passed on earlier. The court concluded: "This looks closer on the record in the written word than when you are here in the room. I am persuaded these are genuine [race-]neutral exercised challenges and the motion is therefore denied."

**Discussion**

The prosecution's use of peremptory challenges to strike prospective jurors on the basis of group bias against members of an identifiable group distinguished on racial, ethnic, or similar grounds violates a defendant's right to a jury trial drawn from a representative cross-section of the community. (*Wheeler*, *supra*, 22 Cal. 3d at pp.276-277.) When a *Batson/Wheeler* motion is made the issue is not whether there is a pattern of systematic exclusion, but whether a particular prospective juror has been challenged because of group bias. (*People v. Avila*, (2006) 38 Cal.4th 491, 549 (*Avila*).)

Trial courts employ a three-step process when deciding motions challenging peremptory strikes. First, the defendant must make out a prima facie case by showing that the totality of relevant facts gives rise to an inference of discriminatory purpose. Second, once the defendant makes out a prima facie case, the burden shifts to the prosecution to explain the exclusion by offering permissible race-neutral explanations. Third, if a race neutral-explanation is offered, the court must decide whether the defendant has proved purposeful racial discrimination. (*Johnson v. California*, (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129].)

On appeal, we review the trial court's ruling under the substantial evidence standard. We presume the prosecution uses peremptory challenges in a constitutional manner, and we defer to the court's ability to distinguish between bona fide reasons and sham excuses. If the court makes a sincere and reasoned effort to evaluate the

nondiscriminatory justifications offered, we defer to the court's ultimate conclusions.  (*Avila*, *supra*, 38 Cal.4th at p. 541.)

Defendant contends the evidence does not support the prosecutor's stated reasons for challenging the seven jurors, and some of the reasons given were false.  We consider each juror in turn, first quoting from the prosecutor's explanation and then considering defendant's challenge to that explanation.

### *Mr. Khan*

#### <u>Reasoning</u>

"Mr. Khan in his jury questionnaire indicated that he was fearful of making the wrong decision that might effect [*sic*] someone's life and when questioned about this; although, he indicated he was all right with the burden of proof, I was concerned in regard to his feelings that his decision would impact a life especially given the circumstances in this case and the fact it is a special circumstances case."

#### <u>Discussion</u>

Mr. Khan is "Asian with 3rd generation Pakistani origin."  Defendant was born in Thailand.  Defendant argues the prosecutor's concern that Khan's feelings might impact his decisions is not supported by the record.

In his juror questionnaire, Khan, who has never served as a juror, stated: "I am concerned about how common people's opinions, which is [*sic*] attached to emotion, can be used as a deciding factor.  I am fearful of making a wrong decision which adversely affects the life of someone else."  During voir dire, Khan indicated his concern about people's opinions being attached to emotion and used as a deciding factor was something was something he thought about "the system in general."

However, after admonition, Kahn stated he was comfortable deciding the case on the evidence and not on emotion.  He also stated he could apply the beyond-a-reasonable-doubt standard of proof.

Although Kahn made these assurances, the prosecution remained concerned about Kahn's statement that he worried his decision would impact a life.  A prosecutor may legitimately exercise a peremptory challenge against a juror who is hesitant about finding a defendant guilty.  (*People v. Jurado*, (2006) 38 Cal.4th 72, 106-108 (*jurado*).)  The prosecutor provided a race-neutral reason for her challenge to Khan.

### *Mr. Maness*

#### **Reasoning**

"As to . . . potential juror Jordan Maness, Mr. Maness was recently arrested in November of 2006 and prosecuted by my office for a domestic violence 273.5 of the Penal Code. [¶] In addition, Mr. Maness, I observed on multiple occasions during the questioning process sitting in a seat with his eyest closed, did not appear to be paying attention when others were being asked questions and on multiple occasions had his eyes closed during the selection of the jurors."

#### **Discussion**

Defendant argues the prosecution's state reason for excluding Maness was not true. Although the prosecution stated Maness had been prosecuted by her office, Maness said no charges had been filed. We are not persuaded that the prosecution relied on facts later proved untrue in excluding Maness. Maness had been arrested regardless of whether he had been charged or prosecuted. Prospective jurors who have been arrested previously may be subject to a peremptory challenge. (*People v. Fields* (1983) 35 Cal.3d 329 348.)

In addition, the prosecution noted Maness sat with closed eyes during voir dire, and she believed he was not paying attention. A juror's lack of attention to the matters at hand is an appropriate basis for rebutting a prim[a] facie case of exclusion based on group bias. (*People v. Reynoso* (2003) 31 Cal.4th 903, 917-920.)

Although defendant argues there is not independent evidence to corroborate the prosecution's claim of inattentiveness, we defer to the trial court, which is in the best position to observe the demeanor of prospective jurors. (*People v. Stanley*, (2006) 39 Cal.4th 913, 939 (*Stanley*).) Here, the trial court found the prosecution's reasons for excluding Maness proper.

### *Ms. Gildersleeve*

#### **Reasoning**

"Ms. Gil[d]ersleeve indicated that she felt that police officers were not always truthful. And when specifically questioned about this, she indicated she had no personal circumstances that had occurred to her. However, she does have that belief, that officers are not always truthful. She has read about it in the newspaper. She's heard about it on the news. [¶] In addition, she also feels that people are not tried fairly and again she based this on reading the newspaper and hearing it on the news. Although, she indicated she had no personal knowledge. She indicated those were her concerns and that she did have those thoughts in her head. In addition, she indicated that she

29

did not have those thoughts in her head.  In addition, she indicated that she did not feel the aiding and abetting law was an appropriate law.  She did not like it.  Based on those comments the challenge was issued as to her."

### Discussion

Defendant labels the reasons stated as pretextual, blatantly false, and unsupported by the record.  Defendant further argues "one cannot read Ms. Gildersleeve as biased in any way.  She had a balanced view of the police."

In her questionnaire, Gildersleeve stated that "a police officer's testimony may not always be truthful if he wants to cover his position."  She also believed not everyone was treated fairly by the criminal justice system.  Gildersleeve also disagreed with the fact that the law does not require the People to prove a defendant's guilt beyond all possible doubt, stating: "I feel sometimes the defendant may be innocent of most charges."  She also stated she did not like the aiding and abetting law and would hesitate "a little bit" in following the law as instructed by the court.

During voir dire, Gildersleeve stated "some officers . . . are truthful, but I do feel for the most part they can cover - - they will cover for themselves."  She did not believe, based on personal experience with a traffic stop, that everyone was treated fairly.

The record before us reveals substantial evidence supporting the prosecutor's stated, race-neutral reasons for excluding Gildersleeve.  Gildersleeve's concerns about law enforcement were a legitimate reason for a peremptory challenge, regardless of whether she harbored bad feelings about the incident.  (*People v. Arias* (1996) 13 Cal.4th 92, 137-138.)  Similarly, Gildersleeve's concerns regarding the fairness of the criminal justice system were a legitimate reason to excuse her as a juror.  (*People v. Gray* (2005) 37 Cal.4th 168, 192 (*Gray*).)

### *Ms. Jurgensen*

### Reasoning

"Ms. Jurgensen is a Filipino female.  Ms. Jurgensen, when talked to specifically by the Court during voir dire appeared to be having language issues with the Court in answering questions.  I then reviewed her questionnaire and it did appear that at times she did not understand the nature of the questions and on further requesting she did appear to me to have some hesitancy in understanding [and] answering the questions that were posed to her and I felt she may have issues understanding what was going on in the courtroom. [¶] Although, she did not specifically state that, that is what I observed during her questioning and also her questionnaire."

## Discussion

Defendant contends the prosecution's reasons for excluding Jurgensen are "patently false." According to defendant, the record does not support the assertion that Jurgensen lacked a sufficient understanding of English. Defendant notes that Jurgensen obtained a bachelor of science degree in engineering and served a year and a half in the Army as an engineer technical specialist.

In her questionnaire, Jurgensen stated she was able to read and understand English. However, her questionnaire revealed difficulties in both responding to questions and communicating her responses.

Although Jurgensen stated she had no opinions regarding prostitution, she went on to comment that "Prostitution needs to be stop. Help this people find a descent job because sometimes prostitution can lead to a crime." She stated she had strong feelings about alcohol use, explaining: "It's not good for the body. Family tends to have arguments. Because when a person is drunk he is not really w/his stable mind."

Jurgensen also responded to questions regarding the law. She strongly agreed that a defendant should be required to prove his or her innocence but also state: "Not because a person was brought to a criminal trial is guilty I need to find out all the evidence first." In addition, she indicated she did not believe she could follow the law as the judge explained it if selected as a juror. Jurgensen stated: "I don't have too many knowledge about law (criminal)." Subsequently, during voir dire, she stated she understood a juror's duty to follow the law.

Defendant argues the prosecution should have further questioned Jurgensen to ascertain her ability to understand English. The People concede the failure to question a juror about the claimed area of concern is a valid factor for us to consider in evaluating the prosecution's stated basis for excluding a juror.

Regardless of the failure to further question Jurgensen, we find sufficient evidence to support the prosecution's stated reasons for excluding her. Subjective factors, not apparent on the record or easily articulable, may legitimately play a critical role in an attorney's peremptory challenge. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1249 (conc. Opn. of Mosk, J.).) Again, since the trial court was in the best position to observe Jurgensen's demeanor and evaluate her responses, the court's implied finding, that the prosecutor's reasons for excusing Jurgensen were sincere and genuine, is entitled to great deference on appeal. (*Stanley*, *supra*, 39 Cal.4th at p. 939.) In addition, a prospective juror's difficulty with English is a valid race-neutral basis for exclusion. (*Jurado*, *supra*, 38 Cal.4th at pp.107-108; *People v. Turner*, (1994) 8 Cal.4th 137, 169.)

***Ms. Pinnock***

**<u>Reasoning</u>**

"As to Gwenetta Pinnock, Ms. Pinnock was an individual, potential juror we questioned outside the presence of the other jurors. Ms. Pinnock had many, many areas of private issues including areas regarding individuals in her family who have been arrested for various crimes and specifically her son who is in prison at this time. While Ms. Pinnock indicated she felt she could still be fair given the circumstances of the fact that her son is in prison [and] was prosecuted in this country and the other individuals in her family and their circumstances, I have some concerns. In addition she indicated she felt the right thing happened. She also said he is my son and she had some feelings about how he was treated even though she kind of went back and forth and said she felt he was treated fairly and yet she also indicated she had some strong feelings because of what happened to him because he was her son."

**<u>Discussion</u>**

Defendant claims the record does not support the prosecution's stated reasons for excusing Pinnock. According to defendant, Pinnock never vacillated about whether her son had been treated fairly.

The record reveals Pinnock's son was convicted of assault with a weapon and sentenced to prison in 2005. Pinnock's husband had been convicted of the same offense and was in prison for a parole violation. Pinnock's brother-in-law was in prison for murder.

A prosecutor may excuse a juror whose relative has been convicted of a crime and sentenced to prison. (*People v. Dunn*, (1995) 40 Cal.App.4th 1039, 1047-1049.) Although Pinnock stated her son had been treated fairly, "a prosecutor may reasonably surmise that a close relativ's adversary contact with the criminal justice system might make a prospective juror unsympathetic to the prosecution." (*People v. Farnam* (2002) 28 Cal.4th 107, 138.) The trial court did not abuse its discretion in finding Pinnock excused for race-neutral reasons.

***Ms. Saenz***

**<u>Reasoning</u>**

"In regard to Ms. Saenz, first, again it was my belief she was a white female. I did not know she indicated Mexican American on her questionnaire. [¶] In Ms. Saenz's questionnaire on multiple occasions she marked answers that indicated [ ] that she would not discuss the issues with other jurors, that she would not lisent to the views presented by other jurors and present her own views. [¶] She indicated she would hold the People to a higher standard of proof than beyond a reasonable doubt and she also said she would disfavor

32

the testimony of police officers while asked on voir dire about these different areas she indicated that those were errors.  Though the Peopl had concerns especially given the number of questions that she answered incorrectly that she either was not paying attention to the questions and answering them incorrectly or in fact she indeed had issues in these areas and was not being completely forthright with the Court and counsel.  [¶] . . . [¶] And also she indicated she was going to hold me to a higher standard of proof and then she also said she disfavored the testimony of police officers."

### Discussion

Defendant argues the record does not support the prosecution's assertion that Saenz was unwilling to deliberate with her fellow jurors.  Defendant contends Saenz merely marked her questionnaire incorrectly.

In her questionnaire, Saenz stated her relationship with a friend who was a police officer would cause her to disfavor witnesses who belonged to law enforcement.  In answering the following question, Saenz stated she believed an officer's testimony would be more truthful than a civilian witness.  However, during voir dire, Saenz stated she would look at the credibility of officers just as she would any other witness.

Saenz, in her questionnaire, stated she would not discuss the case freely with fellow jurors during deliberations or listen to their views.  However, during voir dire the court followed up on her answer, noting "I think this is just a mismarking."  Under further questioning, Saenz agreed with the court that she would freely discuss the case during deliberations and listen to the views of fellow jurors.

Initially, on her questionnaire Saenz marked that she would hold the prosecution to a higher standard of proof than was legally required.  However, she corrected the answer, indicating she could apply the appropriate standard of proof.

The prosecution cited Saenz's contradictory answers as proof that she was either inattentive or untruthful and excused her on those grounds.  The record reveals Saenz did offer conflicting answers between the questionnaire and her voir dire responses, and the trial court did not err in finding she was excused for race-neutral reasons.

### *Ms. Key*

### Reasoning

 "As to Maya Key, again, I indicated in my note, she was white female.   I do see on her questionnaire she does [indicate] white/Hispanic . . . .  [¶] . . .[¶]  She felt that individuals were not trated fairly in the system.  She wasn't able to articulate specifically

why she felt that way, but she did feel that the system did not treat others fairly . . . .   [¶] I believe Ms. Key also had work experience with attorneys that she described as both good and bad . . . ."

### Discussion

Defendant contends the record reveals Key had no work experience with attorneys.  In addition, defendant argues the prosecution failed to further question Key as to why she felt individuals were not treated fairly by the justice system.

In her questionnaire, Key stated she felt the justice system treats people unfairly because of race or ethnic background: "Yes, system[at]ically it appears that minorities are disproportionately arrested, convicted, and sentenced."  The trial court expressed the most concern over the challenge to Key, stating her belief in systematic discrimination based on race was "not devoid of merit."

However, the trial court also acknowledged that Key's belief "raises the inference that the system, law enforcement, District Attorneys in particular would be a concern to the prosecution here as stated is tilted in a way which is unfair subsequent to the initial arrest in particular."  A potential juror's concern about the fairness of the criminal justice system is a valid, race-neutral reason to excuse a juror.  (*Gray*, *supra*, 37 Cal.4th at p. 192.)

Regardless of the correctness of the prosecutor's comments about Key's relationship with attorneys, the court did not abuse its discretion in finding her concerns about the legal system a race-neutral reason for her exclusion.

**Comparative Analysis**

Defendant argues a comparative analysis between jurors excluded and jurors included demonstrates the prosecution's proffered reasons for challenging the subject jurors applied equally to nonminority jurors who were allowed to remain on the jury.  Therefore, the prosecutor's stated reasons for excusing the subject jurors were pretextual.

Our review of defendant's comparative analysis claims does not persuade us that the prosecutor's reasons for excluding the subject jurors were pretextual.[FN4]

> FN4.  The California Supreme Court has granted review on the question of whether an appellate court must first perform a comparative juror analysis for the first time on appeal to determine the genuineness of the prosecution's reasons for peremptorily challenging prospective jurors.  (*People v. Lenix*, review granted

Jan. 24, 2007, S148029.)

Defendant contends Saenz and Juror No. 2831571 had the same view of the burden of proof, but Juror No. 2831571 was not excused. The court instructed both potential jurors on the proper standard, and the People acknowledge Juror No. 2831571 may have also mismarked the answer to the question.

However, the two jurors were not alike in any other respect. Saenz also provided answers of concern to the prosecution regarding how she would conduct herself as a juror and how she would evaluate testimony by police officers. The discrepancy between Saenz's answers on the questionnaire and her answers during voir dire raised concerns about her attentiveness or veracity. Nothing in Juror No. 2831571's answers raised those concerns. A comparison of the two jurors does not undercut the prosecution's stated reasons for excluding Saenz.

Defendant also claims Juror No. 2745616 was in a substantially similar position as Pinnock because the nonexcluded juror had family members, including a first cousin, who had been involved with drugs and brought to trial. However, Pinnock's relatives who had been incarcerated included her son, husband, and brother-in-law. Pinnock, unlike Juror No. 2745616, expressed concern over the fact that her son was in prison.

Defendant makes a similar argument concerning Juror No. 2867453. This juror's brother was involved in crime, but it happened "a long time ago" and the brother had died some 26 years earlier. Neither of these jurors, who had family members in the criminal justice system, was in a position similar to that of Pinnock.

Defendant argues Juror No. 2797833 was substantially similar to Pinnock, Maness, Gildersleeve, and Key because the juror described a similar encounter with police in which an officer had been rude and threatening during a traffic stop. We disagree.

Pinnock was excused because she had close family members in prison. Maness was excused because of a recent arrest and for being inattentive during jury selection. Gildersleeve was excused because she believed officers were not always truthful and people were not always treated fairly. Key was excused because she felt individuals were not treated fairly by the justice system. All of these were race-neutral reasons for exclusion not based on specific contact with law enforcement and therefore not similar to the background of Juror No. 2797833.

Defendant claims Juror No. 2711668 was similar to Khan in that the juror "likewise had to be admonished that emotions could not be allowed [to] impact the verdict." Juror No. 2711668 expressed sympathy for a defendant who is found guilty. Khan expressed a fear

35

of making a wrong decision that could impact someone else's life. These two jurors are not so similar as to vitiate the trial court's conclusion that the prosecution's reasons for excluding jurors were race neutral.

(Lodged Doc. 4 at 15-32).

A state court's finding that a prosecutor has not exhibited discriminatory intent in exercising peremptory challenges "represents a finding of fact of the sort accorded a great degree of deference." *Hernandez*, 500 U.S. at 364. Moreover, as noted by the trial court, that the prosecutor did not strike three African Americans and one Hispanic as jurors in Petitioner's case further undermines any purported showing of purposeful discrimination. *See Cooperwood v. Cambra*, 245 F.3d 1042, 1048 (9th Cir. 2001) (no *Batson* violation where ultimate composition of jury included two African Americans, three Asians, and one Pacific Islander). Accordingly, on this record, Petitioner has failed to meet the burden of demonstrating that the state appellate court's disposition of Petitioner's claim was contrary to or an unreasonable application of clearly established federal law. Nor has Petitioner demonstrated that the state appellate court's decision was an unreasonable application of the facts in light of the evidence presented in the state court proceeding. The conclusion of the state appellate court that the prosecutor did not exercise peremptory challenges based on membership in a particular group is supported by the record. The prosecutor expressed reasonable bases for the use of peremptory challenges against prospective jurors Khan, Maness, Gildersleeve, Pinnock, Key, Jurgensen and Saenz. The stated reasons were "clear and reasonably specific," *Purkett*, 514 U.S. at 768-69, as well as race-neutral. There is no indication in the record that the reasons were pretextual. In addition, Petitioner's argument that the prosecutor's allegedly discriminatory motive was demonstrated by her retention of other jurors with similar characteristics to stricken jurors is without merit. As the California Court of Appeal explained, the retained jurors did not have "comparable characteristics" with the stricken jurors.

Petitioner's *Wheeler-Batson* motions was appropriately denied. Petitioner is not entitled to habeas corpus relief on his claim that the prosecutor's use of peremptory challenges at

trial violated his right to be tried by an impartial jury selected on a race-neutral basis.

## VI.  CONCLUSION

Accordingly, IT IS RECOMMENDED that the pending petition for writ of habeas corpus be denied.  These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: June 3, 2011

*Charlene H. Sorrentino*
_____
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE